IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SUMMIT GROUP HOLDINGS, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. O'DONNELL, )<br>)<br>Defendant. ) | NO. 1:06-CV-339 RL |

**OPINION AND ORDER**

This matter is before the Court on the Motion to Dismiss or in the Alternative to Transfer the Case to the United States District Court for the Northern District of Texas filed by Defendant, Michael J. O'Donnell ("O'Donnell") on November 1, 2006. For the reasons set forth below, the motion is **DENIED**.

BACKGROUND

This is a suit to declare an indemnification agreement unenforceable and declare that O'Donnell's alleged misrepresentations constitute fraud and/or criminal mischief. The issues in the instant motion are personal jurisdiction and venue.

For the purposes of this motion, the plaintiff's allegations are presumed to be true. *Neiman v. Rudolf Wolff & Co., Ltd.*, 619

F.2d 1189, 1190 (7th Cir. 1980). Therefore, the Court assumes the following facts.

This case involves the solicitation, negotiation and execution of related contracts via telephone and e-mail while O'Donnell was in Texas and members of Summit Group Holdings LLC ("Summit"), Douglas Kenna ("Kenna") and William F. Berghoff ("Berghoff"), were in Indiana. Specifically, the parties exchanged approximately 100 e-mails and 195 telephone calls (90% of which were initiated by O'Donnell) regarding these contracts.

O'Donnell first solicited Summit's involvement in the Foris transaction in early Spring 2006 when O'Donnell phoned Kenna in Indiana requesting that Summit, an Indiana company, partially fund the purchase of Foris Gaming, Ltd.'s ("Foris") assets. Foris was in the business of owning and leasing slot machines and other types of gaming equipment to casinos in the United States. Kenna believed that O'Donnell was the Chief Executive Officer of Foris and owned a 25% interest in Foris based on prior conversations with O'Donnell.

O'Donnell subsequently phoned Kenna and Berghoff in Indiana and proposed a deal structure. According to O'Donnell, Summit would "loan" O'Donnell Kenna, Ltd. ("ODK") $1.4 million and Summit would get a 49% ownership interest in ODK. ODK would combine the $1.4 million with $1.5 million provided by Foris Gaming Red River, LLC ("FGRR").  The $2.9 million would be used to purchase the assets

pursuant to an asset purchase agreement.  O'Donnell would transfer his preexisting interest in FGRR (represented to be 51%)[1] to ODK.

During March and continuing through June of 2006, O'Donnell sent Kenna and Berghoff e-mails attaching documents regarding the transaction including financial statements, investment summaries, ODK financial information, Foris sales and commission reports, a comfort letter, an FGRR operating agreement and FGRR organizational minutes.  These documents purported to show, among other things, O'Donnell's ownership interest in FGRR and the financial position of the various companies involved in the deal. The e-mails also reflected the projected income from the operation of a business with the to-be-acquired assets. Kenna and Berghoff received and reviewed all e-mails and attachments from O'Donnell in Indiana.

O'Donnell also attached copies of FGRR's and Foris's acquisition-related documents to e-mails sent to Berghoff and/or Kenna. These documents included an asset purchase agreement and an assignment agreement.

Based on these communications, Summit agreed to the transaction and the parties began negotiating a letter of intent over e-mail. O'Donnell provided Summit with the first draft, then Summit's lawyers in Indiana revised the draft and e-mailed it to O'Donnell. O'Donnell e-mailed a signed copy of the letter of intent back to Summit's counsel.  The final version provided that Summit

---

[1] The other owner of FGRR was Red River West, LLC ("RRW").

-3-

would loan ODK $1.4 million, that the loan term was 42 months and that the loan amount would be used to purchase specific assets.

After Summit and O'Donnell signed the letter of intent, O'Donnell told Berghoff that RRW demanded an option agreement. The proposed option agreement provided that in the event that ODK did not contribute $1.4 million to FGRR by June 30, 2006, RRW could exercise an option to become the sole owner of FGRR. By e-mail O'Donnell demanded Summit indemnify him in his personal capacity or else Summit could no longer participate in the transaction. O'Donnell followed up with a telephone call to Berghoff who was in Indiana in which O'Donnell represented that he would personally lose $750,000 if RRW exercised its option.

Then O'Donnell e-mailed Berghoff attaching a copy of the option agreement between ODK and RRW signed by O'Donnell on behalf of ODK. Two days later O'Donnell sent another e-mail requesting indemnification and Summit's counsel in Indiana e-mailed him a signed copy of a revised indemnification agreement.

On June 22, 2006, O'Donnell traveled to Fort Wayne, Indiana, to meet with Berghoff. At the meeting, they discussed the Foris transaction and another investment opportunity. Following this meeting on June 25 and 26, O'Donnell e-mailed Berghoff six times attaching Foris acquisition-related documents.

After two extensions of time on the closing which O'Donnell told Summit he had negotiated with FGRR, the closing was set for

August 4, 2006. In preparation Summit's counsel reviewed documents received from RRW and O'Donnell and spoke to Joe Kirk of RRW and Brandon Freeman, an owner of Foris, regarding the Foris acquisition. During these conversations, Summit's counsel learned (1) that O'Donnell was not an owner of FGRR, (2) that O'Donnell was not an owner of Foris, (3) that O'Donnell would not lose any amount of money if RRW exercised its option pursuant to the option agreement, (4) that O'Donnell's representations about Foris' projected income were unreasonably positive and had been questioned by RRW and (5) that O'Donnell had not negotiated the extensions of time for the closing as he had represented.

By this time, O'Donnell had also failed to provide documentation Summit requested regarding the transaction. For instance, O'Donnell never sent Summit signed copies of the FGRR operating agreement, signed copies of the ODK operating agreement, a fully executed copy of the asset purchase agreement, evidence of an agreement between ODK and RRW regarding their contributions to FGRR, documentation that established that ODK had no liabilities or obligations other than those relating to the FGRR transaction, and answers to Summit's questions regarding other aspects of ODK's corporate existence and the parties' negotiations regarding the FGRR transaction.

Summit chose not to enter into the FGRR transaction. On August 5, 2006, O'Donnell sent Summit's counsel an e-mail providing notice

of his intent to enforce the indemnification agreement against Summit. On October 12, 2006, Summit filed the instant declaratory judgment suit.

O'Donnell argues that he has not purposefully established sufficient minimum contacts for this Court to exercise personal jurisdiction over him nor does the exercise of personal jurisdiction in this case comport with fair play and substantial justice. He additionally argues that either venue is improper in the Northern District of Indiana or transfer of venue to the Northern District of Texas is appropriate.

Summit counters that O'Donnell's e-mails and telephone calls to Indiana which were business dealings with Summit in furtherance of the alleged fraud are sufficient for this Court to exercise personal jurisdiction over O'Donnell. Moreover, venue, according to Summit, is proper in the Northern District of Indiana because a substantial part of the events giving rise to this lawsuit took place in the Northern District of Indiana and Defendant has not established that Texas is a clearly more convenient forum.

DISCUSSION

*Personal Jurisdiction*

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, O'Donnell challenges the Court's personal jurisdiction over him. Summit bears the burden of demonstrating personal

jurisdiction over O'Donnell exists.  *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003).  Summit need only make a *prima facie* showing that O'Donnell is subject to personal jurisdiction here.  *Id.* at 782-783.

A federal court sitting in diversity jurisdiction acquires personal jurisdiction over a non-resident defendant in accordance with the long-arm statute of the state in which it sits.  *Id.* at 779.  In Indiana, the long-arm statute, provides in pertinent part that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." Indiana Trial Rule 4.4(A).

This long-arm statute extends to the limits of federal due process.  *LinkAmerica Corp. v. Albert*, No. 49S04-0603-cv-88, 2006 WL 3491623, at *3 (Ind. Dec. 5, 2006). And both parties agree that federal due process is the only limit on the Court's exercise of personal jurisdiction over O'Donnell.

Due process requires that a non-resident defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)(quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). In accordance with due process, a court may exercise specific or general jurisdiction. Here, the analysis is

limited to specific jurisdiction because Summit does not argue general jurisdiction applies.

Specific jurisdiction may be based on a non-resident defendant's modest contacts with the forum if they have a substantial connection to the plaintiff's action and if the defendant established his contacts with the forum state by purposefully availing himself of the privilege of conducting business there. *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73 (1985). The minimum contacts may not be "random," "fortuitous" or "attenuated" or of the "unilateral activity of another party or a third person." *Id.* at 474-76. A defendant's conduct and connection with the forum state should be such that he should reasonably anticipate being haled into court there. *Id.* at 472.

Due process also requires the exercise of jurisdiction to comport with "traditional notions of fair play and substantial justice." *Id.* at 476-77. To determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice" courts may evaluate the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining a convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of

-8-

the several states in furthering fundamental substantive social policies. *Id.*

Here, O'Donnell has had contacts with Indiana concerning the Foris transaction sufficient to support specific jurisdiction in a suit concerning the indemnification agreement. When O'Donnell deliberately reached out beyond Texas and solicited, negotiated, and entered into a 42 month loan, an indemnification agreement and a partnership relationship with Summit in furtherance of the Foris acquisition, he purposefully established minimum contacts with Indiana and availed himself of the privilege of conducting business in Indiana. *Id.* at 479; *see also Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 284 (7th Cir. 1990)(finding personal jurisdiction in Illinois proper because New York Company solicited a long-term business relationship via telephone and thereby "knowingly reached out to [the Illinois] company and created a continuing relationship or obligation"); *KnowledgeAZ, Inc. v. Jim Walter Resources, Inc.*, 452 F. Supp. 2d 882, 896 (S.D. Ind. 2006)(finding personal jurisdiction in Indiana proper where non-resident defendant solicited and executed a long-term license agreement with an Indiana company via telephone, fax and e-mail).  This is so despite O'Donnell's lack of physical presence in Indiana.[2] *E.g., Heritage House,* 906 F.2d at 283

---

[2] To be sure, the record indicates that O'Donnell did in fact travel to Indiana on June 22, 2006, in furtherance of the Foris

("Continental created a relationship which is naturally based on telephone and mail contacts rather than physical presence, and it should not be able to avoid jurisdiction based on that distinction").

In addition, O'Donnell's scheme to perpetrate fraud in Indiana manifested through e-mails and telephone calls creates sufficient minimum contacts to satisfy due process. *E.g., FMC Corp. v. Varonos*, 892 F.2d 1308, 1313 (7th Cir. 1990)(holding that minimum contacts were met where defendant sent telexes and faxed reports to plaintiff in Illinois to effectuate a scheme to defraud the company); *Mercantile Capital Partners v. Agenzia Sports, Inc.,* No. 04c5571, 2005 WL 351926, *2-3 (N.D. Ill. Feb. 10, 2005)(finding minimum contacts sufficient to confer jurisdiction over nonresident defendant where mailings by non-resident defendants to Illinois residents were sent with an intent to further a fraudulent scheme); *Mullen v. Cogdell*, 643 N.E.2d 390, 397-98 (Ind. Ct. App. 1994) (finding exercise of personal jurisdiction in Indiana proper where defendant sent correspondence and made telephone calls in

---

transaction. This court is not persuaded by O'Donnell's bald assertion that he traveled to Indiana in his corporate capacity as a member of Foris Gaming. *See Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 716 n.2 (7th Cir. 1998)("We do not think it appropriate or required by the constitution that a corporate agent be shielded from personal jurisdiction if he, as agent of the corporation, commits a tortious act in the forum." (citation omitted)). Rather, O'Donnell's visit to Indiana provides additional contacts to support the exercise of personal jurisdiction here.

furtherance of alleged fraud in real estate transaction involving Indiana residents). Indeed, since this case is based on intentional misrepresentations, O'Donnell deliberately intended to harm Summit (which he knew to be an Indiana company), and, therefore, he should have foreseen that he could be required to answer for his actions in Indiana.

O'Donnell asserts that the alleged misrepresentations do not arise out of or relate to the indemnification agreement, but rather, "[a]t the heart of this lawsuit is an isolated, one-time agreement." According to the allegations in the complaint, however, had O'Donnell not misrepresented aspects of the Foris transaction, Summit would never have agreed to the transaction, entered the letter of intent or executed the indemnification agreement. Indeed, according to its terms, if Summit refused to enter into the indemnification agreement, it could no longer participate in the Foris transaction. Accordingly, O'Donnell's attempt to segregate his contacts with Indiana is not persuasive.

O'Donnell further argues that all of his alleged conduct occurred, if at all, in the State of Texas. Even if O'Donnell was in Texas preparing for the Foris transaction, this does not prove jurisdiction in Indiana is improper. If a "defendant's efforts are directed toward a particular jurisdiction, the fact that the actor did not actually enter the jurisdiction is not of crucial importance." *Purdue,* 338 F.3d at 781.

Additionally, all of O'Donnell's arguments regarding the availability of Texas as a forum for this litigation do not persuade the Court that minimum contacts in Indiana are wanting. Regardless of a Texas choice of law provision, that O'Donnell sends e-mails and calls people in Indiana from Texas, or any other conduct occurring in Texas, conventional minimum contacts analysis controls. *See, e.g., Purdue*, 338 F.3d at 781 ("[W]e must take into account prior negotiations, contemplated future consequences, the terms of the contract and the parties' course of actual dealing with each other. It is these factors and this perspective that ought to guide the judicial inquiry as to whether the defendant purposefully has established minimum contacts with the forum." (internal citation omitted)).

Finally, considerations of fair play and substantial justice support the exercise of personal jurisdiction here. Indiana has a substantial interest in redressing alleged wrongdoing against an Indiana company. And O'Donnell does not indicate any specific circumstances differentiating his burdens from inconveniences any nonresident individual defendant would also experience. Although "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent," *Burger King*, 471 U.S. at 478 (citations omitted), considerations of fair play and substantial justices weigh in favor

of exercising personal jurisdiction over O'Donnell in Indiana. "And because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474 (citation omitted).

*Venue*

Federal rule of Civil Procedure 12(b)(3) authorizes a district court to dismiss an action for improper venue. Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a)(2). "[C]ourts examining venue under section 1391(a)(2) in misrepresentation and fraud cases have held that venue is proper in the district to which a document containing the misrepresentation at issue was sent." *Mercantile Capital Partners*, 2005 WL 251926, at *5.  Here, documents containing misrepresentations were sent to Indiana via e-mail, such as the FGRR operating agreement purporting to show that O'Donnell owned part of it.

Further evidence of proper venue is that Summit accepted contracts in Indiana and the alleged injury occurred in Indiana. *Hispec Wheel & Tire, Inc. v. Tredit Tire & Wheel Co., Inc.*, No.

3:04cv340, 2005 WL 1983846, *7 (N.D. Ind. August 11, 2005)(finding venue proper in plaintiff's home state for fraud claim because plaintiff's reliance and detrimental effects of reliance occurred there). Thus a substantial part of the events giving rise to this action occurred in Indiana and venue is proper in this district.

*Transfer*

A case may be transferred pursuant to 28 U.S.C. § 1404(a) "[f]or the convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  The movant has the burden of establishing that the "transferee forum is clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986).  And Summit's choice of forum should not be lightly set aside especially since the action is brought in its home forum. *E.g., Dairy Industries Supply Ass'n v. La Buy*, 207 F.2d 554, 558 (7th Cir. 1953).

Here, O'Donnell has not met his burden to prove that the transferee forum is clearly more convenient. O'Donnell asks this Court to find that Summit is more capable of paying for out-of-state litigation than he is, that more pertinent information is in Texas than in Indiana, and that the bulk of the witnesses reside in Texas. On all three issues, however, O'Donnell fails to offer a sufficient factual basis for his claims. For instance, O'Donnell

makes no showing of what information is in Texas versus Indiana or why such information is difficult to bring to Indiana. Nor does O'Donnell show the parties' financials, nor what witness testimony will be elicited, the materiality of each witness's testimony, whether certain testimony will be cumulative, whether the witnesses reside in Indiana or Texas, whether the witnesses are willing to travel to Indiana, or the degree of inconvenience for each witness. *See Samsung Electronics Co., Ltd. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 718-19 (E.D. Va. 2005). Therefore, this Court concludes that neither O'Donnell nor any witnesses would not be unduly inconvenienced by attending trial in Indiana.

Further, the interests of justice do not favor O'Donnell. O'Donnell argues that Summit should have waited to be sued and not filed a declaratory judgment action. This Court is not persuaded that Summit's initiation of the action, without more, proves that the case should be transferred in the interests of justice.

O'Donnell also argues that Texas is a more appropriate forum because Texas law will be applied. "Whether [Texas] law is to be applied or not, this determination will not override the other considerations relevant to the transfer issue all of which have been decided against Defendant." *Boone v. Sulphur Creek Resort, Inc.*, 749 F. Supp. 195, 202 (S.D. Ind. 1990). Therefore, because the convenience of the parties and witnesses and the interest of

-15-

justice does not weigh in favor of transfer, O'Donnell's motion to transfer is **DENIED**.

CONCLUSION

For the reasons set forth above, Defendant's motion is **DENIED**.

**DATED: May 25, 2007**                              **/s/ RUDY LOZANO, Judge**
                                                     **United States District Court**